IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

SYLVIA D. DeLONG,               )
                                )
v.                              )   No. 2:03-0059
                                )
JO ANNE B. BARNHART,             )
Commissioner of Social Security )


To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge


REPORT AND RECOMMENDATION

The plaintiff filed this action, pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Secretary of Health and Human Services denying supplemental security income ("SSI") under the Social Security Act.

On September 12, 2000, the plaintiff filed an application for SSI, alleging that she became disabled on September 27, 1999, due to heart trouble, back injury, asthma, mental problems and unspecified problems after ovarian surgery. (Tr. 95-104). Her applications were denied initially (Tr. 62-63), and upon reconsideration (Tr. 64-65). A hearing was held on October 11, 2002, at which the plaintiff was represented by counsel. (Tr. 26-61). On December 20, 2002, an Administrative Law Judge ("ALJ") found that the plaintiff was not under a disability. (Tr. 11-20). This decision became final when the Appeals Council denied her request for review on April 23, 2003. (Tr. 5-7).

Currently pending before the Court is the plaintiff's motion for judgment on the record (Docket Entry No. 13), to which the defendant filed a response (Docket Entry No. 14).

I.  BACKGROUND

The medical record in this case contains many documents related to the plaintiff's physical and mental impairments.  The ALJ found that the plaintiff had severe impairments, including "mild degenerative disc disease, asthma, heart palpitations, borderline intellectual functioning, generalized anxiety disorder, and reduced far vision (20/100 bilateral uncorrected)." (Tr. 19).  The plaintiff does not contest these findings, instead focusing her appeal to this Court on the existence of a mental impairment under 12.05(C) of the Listing of Impairments, a listing so severe as to be presumptively disabling.  Therefore, the review of the record will focus on relevant facts regarding Listing 12.05(C), the mental retardation listing.

On September 27, 2000, the plaintiff underwent a psychological evaluation, performed by Emily Rummel, M.A., and countersigned by Roy Bilbrey, Ph.D., at the request of the plaintiff's attorney. (Tr. 211-219).  The diagnostic impression upon examination was anxiety disorder, not otherwise specified, and mild mental retardation.  (Tr. 216).  I.Q. testing yielded a verbal score of 65, a performance score of 74, and a full scale score of 66.  (Tr. 217).  Academic testing revealed that the plaintiff could read at the fourth grade level and perform arithmetic at the third grade level. (Tr. 216).  In addition, a mental medical assessment was completed (Tr. 220-222), indicating the plaintiff's ability to deal with the public (poor/none), deal with work stress (poor/none), function independently (poor/none), relate to co-workers (fair), use judgment (fair), interact with supervisors (fair), maintain concentration (fair) and follow work rules (good).  (Tr. 220).

Medical records were received from Dale Hollow Mental Health Center, covering the period from September 13, 2000, through February 16, 2001.  (Tr. 329-55).  A psychiatric evaluation dated December 18, 2000, yielded a diagnoses of dysthymic disorder, chronic post traumatic stress

2

disorder, generalized anxiety disorder, and dependent personality traits. (Tr. 332). A physician's statement dated January 10, 2002, indicated that the plaintiff was last seen on November 14, 2001, at which time she was not capable of maintaining employment due to a dysthmic disorder, and a generalized anxiety disorder. (Tr. 389).

In a Psychiatric Review Technique Form, dated March 9, 2001, a DDS physician found that the plaintiff did not have a medically determinable impairment that precisely satisfied the mental retardation listing. (Tr. 274). A clinically related group assessment dated February 28, 2002, revealed a diagnosis of neurotic depression with mild impairment in the activities of daily living, a moderate limitation in interpersonal functioning, a mild limitation in sustaining concentration, task performance, and pace, and a moderate restriction in adaptation. (Tr. 396-98).

A Disability Determination Services ("DDS") consultative psychological evaluation dated August 12, 2002, was received from Stephen Hardison, M.A., countersigned by William R. Sewell, Ph.D. (Tr. 422-27). The diagnostic impression upon evaluation was an anxiety disorder, not otherwise specified. (Tr. 426). The plaintiff was assessed to have a verbal I.Q. of 64, a performance I.Q. of 60, and a full scale I.Q. of 59. (Tr. 425). Results indicated that the plaintiff read at a third grade level and performed arithmetic at a second grade level. (Id.) However, the DDS examiner stated that the I.Q. findings "could possibly somewhat under-represent [the plaintiff's] true intellectual capabilities and performance may have been partially affected adversely by motivational factors and also by some cultural deprivation and lack of education." (Id.) Although the examiner opined that the plaintiff's mental abilities were "in the borderline range at best," he declined to give a diagnosis of mental retardation. (Tr. 426).

3

At the hearing, the plaintiff testified that she was 37 years old, that she lived in a trailer with her 14 year old niece, had no income, and that she watched television during the day. (Tr. 31, 50). The plaintiff testified to having had approximately seven years of schooling, going to a private school for two years, and repeating two grades. (Tr. 31-32). She stated that she was a slow learner who had been in special education classes. (Tr. 32-33). She also testified that she worked at Perdue Farms as a security guard in 2001, but that she quit after a week because she could not do the paperwork. (Tr. 34-35).[1]

Based on the record, the ALJ made the following determinations (Tr. 19-20):

1. The claimant has not engaged in substantial gainful activity since the alleged onset date. Work activity after this date was not substantially gainful activity. However it is indicative of the claimant's ability to work.

2. The claimant has "severe" impairments including: mild degenerative disc disease, asthma, heart palpitations, borderline intellectual functioning, generalized anxiety disorder, and reduced far vision (20/100 bilateral uncorrected).

3. The claimant's impairments, considered individually and in combination, do not meet or equal in severity any impairment set forth in 20 C.F.R. Part 404, Subpart P, and Appendix 1.

4. The claimant's allegations of pain and functional limitations are not fully credible for the reasons discussed above.

5. The claimant retains the combined residual functional capacity to perform a limited range of light, unskilled work activity as described above.

6. The claimant can perform past relevant work, per vocational expert testimony.

7. The claimant is not disabled within the meaning of the Act.

---

[1] As the ALJ indicated (Tr. 19), the plaintiff's testimony about her past employment was confusing (Tr. 34-35, 52-55). Her earnings statement reflects three short term jobs in 1997, three short term jobs in 1999, one job in 1999 for a longer duration, six short term jobs in 2000 and a job as a landscaper in 2000 for which she was paid $1,755.26. The record reflects no employment in 2001 or 2002 (Tr. 89-94).

## II. DISCUSSION

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether or not the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. §§ 405(g) and 1382(c)(3); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); <u>Gibson v. Secretary of Health, Education & Welfare</u>, 678 F.2d 653 (6th Cir. 1982). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the Court might have decided the case differently based on substantial evidence to the contrary. <u>Her v. Commissioner of Soc. Sec.</u>, 203 F.3d 388, 389-90 (6th Cir. 1999).

A reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. <u>Garner v. Heckler</u>, 745 F.2d 383, 387 (6th Cir. 1984). Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. It is more than a mere scintilla of evidence. <u>Richardson</u>, <u>supra</u>; <u>Le Master v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976). The Court must accept the ALJ's explicit findings and determination unless the record, as a whole, is without substantial evidence to support the ALJ's determination. <u>Houston v. Secretary of Health & Human Servs.</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Hephner v. Mathews</u>, 574 F.2d 359, 362 (6th Cir. 1978).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. The five steps are as follows: (1) If claimant is doing substantial gainful activity, she is not disabled; (2) If claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled; (3) If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period

5

of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry; (4) If claimant's impairment does not prevent her from doing her past relevant work, she is not disabled; (5) Even if claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity ("RFC") and vocational factors, such as age, education, and past work experience, she is not disabled.[2] See 20 C.F.R. § 404.1520. See also Tyra v. Secretary of Health & Human Servs., 896 F.2d 1024, 1028-29 (6th Cir. 1990); Farris v. Secretary of Health & Human Servs., 773 F.2d 85, 88-89 (6th Cir. 1985); Mowery v. Heckler, 771 F.2d 966, 969-70 (6th Cir. 1985); Houston, supra.

The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. Id. See 42 U.S.C. § 1382c(a)(3)(C); 20 C.F.R. §§ 404.1512 (a), (c), 404.1513(d); Landsaw v. Secretary of Health & Human Servs., 803 F.2d 211, 214 (6th Cir. 1986); Tyra, 896 F.2d at 1028-29. However, the Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 432(d)(2)(C); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. Allen v. Califano, 613 F.2d 139, 145 (6th Cir. 1980); Hephner, supra. To rebut a *prima facie* case,

---

[2]This latter factor is considered regardless of whether such work exists in the immediate area in which plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. Ragan v. Finch, 435 F.2d 239, 241 (6th Cir. 1970).

6

the Commissioner must come forward with particularized proof of the plaintiff's individual vocational qualifications to perform specific jobs. O'Banner v. Secretary of Health, Education & Welfare, 587 F.2d 321 (6th Cir. 1978).

The plaintiff's impairment meets Listing 12.05C

The plaintiff argues that she is presumptively disabled because her severe impairment "meets or equals a listed impairment." 20 C.F.R. § 404.1520(d). Specifically, she contends that her impairment meets or equals Listing 12.05(C), which provides, in pertinent part, as follows:

> Mental Retardation and Autism: Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22) . . . the required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitations of function.

The regulations explain that, in order to meet the requirement of 12.05(C), "specific symptoms, signs, and laboratory findings in the paragraph A criteria of any of the listings in this section cannot be considered in isolation from the description of the mental disorder contained at the beginning of each listing category." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A). Thus, based on this characterization, a plaintiff must: (1) suffer from "significantly subaverage general intellectual functioning," (2) suffer from "deficits in adaptive functioning," (3) initially manifest such deficits during the developmental period (before age 22), and (4) meet one of the four criteria (A, B, C, or D). See Foster v. Halter, 279 F.3d 348, 354-55 (6th Cir. 2001).

7

1. The plaintiff's impairment meets the standard in the preamble to 12.05

The record shows that the plaintiff clearly suffers from "significant subaverage general intellectual functioning" and "deficits in adaptive functioning," as required by the preamble to Listing 12.05. The Commissioner cites Luckey v. United States Dep't of Health & Human Servs., 890 F.2d 666 (4th Cir. 1989), for the proposition that there must be a "clear manifestation of mental retardation" before age 22, and contrasted the evidence of such manifestation in Luckey to the plaintiff's ability to read and write "despite her allegations to the contrary." Docket Entry No. 14, at 7. The Court agrees that the plaintiff has an ability to read and write, but there is no substantial evidence in the record to show that she reads above a fourth grade level.[3]

The Court also agrees with the Commissioner that there must be a "manifestation of mental retardation" before age 22. See Foster v. Halter, 279 F.3d 348 (6th Cir. 2001). Although both the plaintiff in Foster and the plaintiff herein did not have IQ tests or other evaluation results prior to age 22, the Court in Foster found that the only evidence in the record relating to the plaintiff's intellectual functioning before age 22 was that she left school after completing the ninth grade. In contrast, the record in this case shows that the plaintiff withdrew from school in the seventh grade, that she repeated two grades, and, through her testimony, that she had attended special education classes and was "always slow" (Tr. 33).[4] The Court finds that there is not substantial

---

[3]In Luckey, the Fourth Circuit found that there can be many possible reasons an adult had not had IQ tests before age 22, that there was no evidence that the plaintiff's IQ had changed, and that his work history could not be used to prove non-disability when the requirements of Listing 12.05(C) were otherwise met. 890 F.2d at 667.

[4]The Court notes that the plaintiff did not raise the issue of special education classes for the first time during the hearing before the ALJ. See Tr. 121 and 213. At the hearing, the plaintiff was not sure how many years she had gone to school, but acknowledged that she was "always slow." (Tr. 33). She reported to the psychological examiner on September 27, 2000, that she had a fifth grade

8

evidence to support the ALJ's having discredited the plaintiff's testimony about her schooling, see infra at 11-12, and finds that there is not substantial evidence to support a finding that the plaintiff's deficits were not manifested prior to age 22.[5] Thus the remaining question is not whether the plaintiff met the criteria in the preamble to Listing 12.05(C), but whether she has a valid verbal, performance, or full scale IQ of 60 to 70, and otherwise meets the listing.

2. The plaintiff has a valid verbal, performance, or full scale IQ of 60 to 70

Section 12.00 D of the Appendix provides that "where more than one I.Q. is customarily derived from the test administered . . . the lowest of these is used in conjunction with listing 12.05." It must be noted that on the [Wechsler Adult Intelligence Scale (WAIS)], for example, IQs of 70 and below are characteristic of approximately the lowest 2 percent of the general population." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 D. In addition, Section 12.00 D requires that an I.Q. score be valid. The I.Q. score must reflect the plaintiff's true abilities as demonstrated by her performance at work, household management and social functioning. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 B-C. In assessing the validity of a plaintiff's I.Q., "information from both medical and nonmedical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress)." 20 C.F.R. Pt. 404, Subpt. P, App. 1., § 12.00 D.

---

education and was 14 years old when she left school (Tr. 213), although her attendance records appear to show that she withdrew from the seventh grade in October of 1979. (Tr. 152-57).

[5]The ALJ did not make a specific finding that her deficits were not manifested before age 22, but such a finding can be inferred from his having discredited the plaintiff's testimony about having been in special education classes.

9

The ALJ discredits the results of the psychological evaluation, performed by Emily Rummel, M.A., and countersigned by Roy Bilbrey, Ph.D., (Tr. 211-219) for six stated reasons:

> 1. [The consultative psychological/mental status examiner, Stephen Hardison, M.A.] was more partial when he found the I.Q. scores invalid while [the examiner Emily Rummel, M.A.] had a vested interest in the estimate of validity.
>
> 2. The claimant's psychologist never mentioned mental retardation or low cognitive ability. They were more familiar with the claimant and the claimant's intellectual capability would have been deserving of a passing reference or observation if claimant were viewed as mentally retarded.
>
> 3. The school records only reflect attendance. There is no evidence of special education that the claimant alleged.
>
> 4. The claimant apparently went to a private school for two years. Hard to imagine parents of modest income paying for education if the claimant was in special education classes anyway.
>
> 5. The claimant called one psychologist to tell them that she was lost and would be late. So apparently the claimant could read a letter and use the phone.
>
> 6. I.Q. of 59 far too low for above activity. Also the claimant testified that she had a driver's license and drove locally to evaluations and elsewhere. In addition, I note and concur with the comments by the DDS medical consultant at [Tr. 235] discrediting the findings by [Emily Rummel, M.A.]. I agree that the claimant may be functioning within the borderline intellectual range, but she is not mentally retarded.

(Tr. 17-18).

For a number of reasons, the Court is troubled by the reasoning used by the ALJ to discredit the I.Q. scores and find that the plaintiff does not have mild mental retardation:

1. The Court does not understand the reasoning behind the ALJ's finding that Stephen Hardison, M.A., was "more partial when he found the I.Q. scores invalid" (Tr. 17),[6] since the ALJ

---

[6] It appears that the ALJ intended to describe Mr. Hardison as "more impartial" rather than "more partial."

does not explain how he arrives at this conclusion. Mr. Hardison indicated that the plaintiff's verbal I.Q. of 64, performance I.Q. of 60, and full scale I.Q. of 59 were "in the borderline range at best," although he opined the I.Q. test "could somewhat under-represent [the plaintiff's] true intellectual potential." (Tr. 425-26). While he declined to give the plaintiff a diagnosis of mental retardation, he did not explicitly find that the I.Q. scores were invalid. (Tr. 426).

2. Although the ALJ found that Emily Rummel, M.A., had a "vested interest in [his] estimate of validity" (Tr. 17), the ALJ did not explain how he arrived at this conclusion. Apparently, the ALJ was concerned that the psychological examination performed by Ms. Rummel was done at the request of the plaintiff's attorney. However, there is no indication that Ms. Rummel was biased in any way, or that any such bias led to a deflation of the results of the I.Q. test, which yielded a verbal score of 65, a performance score of 74, and a full scale score of 66 (Tr. 217), all of which were higher than the I.Q. scores Mr. Hardison found. Furthermore, as the plaintiff notes, the fact that both psychological examiners found a verbal I.Q. between 64 and 65 clearly indicates consistent results.

3. The ALJ notes that the plaintiff went to a private school for two years. Inexplicably, he concludes that it is "[h]ard to imagine parents of modest income paying for education if the claimant was in special education classes anyway." (Tr. 18). This statement, used to help discredit the plaintiff's testimony that she attended special education classes since kindergarten (Tr. 32-33, 121, 213), the findings of examinations, and to find the plaintiff to be not disabled, is completely unsupported by any empirical evidence.[7]

---

[7]Specifically, there is no evidence that her parents paid for her to go to a private school. She might have received free tuition to go to the parochial school. In addition, an inference that parents of modest means would not pay for a private school so that their child could receive special

11

4. As the ALJ noted, the plaintiff could read a letter, use the phone, and drive. (Tr. 18). In support, the ALJ deduced that the plaintiff could read a letter when she called a psychologist to report she was lost and would be late. There is no evidence in the record of what letter she read or that she read any letter. Furthermore, the plaintiff testified that while she can read "small portions" of the newspaper, her mother helps her read letters from her attorney and from the Social Security Administration. (Tr. 33). Coupled with the DDS finding that the plaintiff can only read at a fourth grade level (Tr. 425), the record reflects that the plaintiff has much more difficulty reading than the findings of the ALJ suggest. In addition, her ability to use a phone and drive do not exempt her from a finding of mild mental retardation.

As to the finding that the plaintiff's academic and vocational record, in addition to her activities of daily living, did not portray significant difficulties in mental functioning, the undersigned concludes that neither substantial evidence nor the law of this Circuit support that finding. With all due respect to the ALJ's opportunity to observe the plaintiff during the hearing and his experience in that regard, he is not (nor does he purport to be) an expert in the field of psychology or psychiatry, and a diagnosis of mild mental retardation, at least as compared with borderline intellectual functioning, may not be readily apparent to a lay observer.

---

education classes is unsupportable.

The Commissioner also engages in an unsupported inference when she suggests that it was reasonable for the ALJ to assume that the plaintiff's grades were "for the most part average." Docket Entry No. 14, at 6. First, the ALJ did not make such a finding. Second, the plaintiff's attendance records show that the plaintiff withdrew from seventh grade at age 14, collaborating her testimony that she repeated two grades. The fact that she repeated two grades in and of itself belies any assumption that the plaintiff's grades were mostly average.

12

In Brown v. Secretary, 948 F.2d 268 (6th Cir. 1991), the Sixth Circuit addressed an ALJ's decision that a full-scale I.Q. score of 68 was inconsistent with the claimant's functional abilities. In that case, the following facts were asserted in support of the ALJ's decision:

> Mr. Brown is able to use public transit; he has a driver's license; he visits friends; he is able to make change at a grocery store; he can do his own laundry and clean his room; he completed sixth grade; he has a limited level of reading comprehension (Mr. Brown stated that he can follow a road atlas, and a friend testified she had seen him reading a newspaper); and as a truck driver, Mr. Brown recorded mileage, the hours he worked, and the places he drove.

Id. at 270. After this recitation, the Court held that these facts are not inconsistent with a valid I.Q. of 68, and that no empirical evidence on that record suggested otherwise. Id. The Court had little trouble determining that an individual with a limited ability to read and who could perform simple tasks and work as a truck driver could also suffer from such impaired intellectual functioning, noting the following language from the Diagnostic and Statistical Manual of Mental Disorders ("DSM") (3d ed. 1987):

> People with [Mild] Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5), have minimal impairment in sensorimotor areas, and often are not distinguishable from normal children until a later age. By their late teens they can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).[8]

948 F.2d at 270. After noting this language, Judge Merritt, writing for the Court, reasoned as follows:

---

[8] This definition did not significantly change in the fourth edition of the DSM. Diagnostic and Statistical Manual of Mental Disorders ("DSM") (4th ed. 2000) at 43.

13

> The Secretary, in promulgating Listing 12.05C, expressly singled out individuals with Mild Mental Retardation for special treatment in determining entitlements to disability benefits. Mr. Brown's I.Q. scores indicate Mild Mental Retardation. Furthermore, Mr. Brown's biography fits squarely within the DSM-III-R profile of a mildly retarded individual.

Id.

If not binding, the reasoning and holding of Brown is certainly highly persuasive in this case, given the similarities between the reports of functional abilities and the vocational histories of these plaintiffs. Mr. Brown completed the sixth grade, while Ms. DeLong apparently withdrew from school within the first month of the seventh grade, see n.7, supra, having repeated two grades (Tr. 31-32). Mr. Brown was able to achieve reading comprehension at a fifth/sixth grade level and mathematical achievement at a sixth grade level, while Ms. DeLong reads at the fourth grade level and performs arithmetic at the third grade level (Tr. 216). In terms of vocational abilities, Mr. Brown was able to work as a truck driver, and keep appropriate records of mileage, hours, and the places he drove, while Ms. DeLong's vocational history is not as impressive, with no consistent or prolonged employment, and having quit after a week of being a security guard because she was unable to do the paperwork (Tr. 34-35). Furthermore, Mr. Brown's I.Q. results were higher than Ms. DeLong's results.

The ALJ's finding the plaintiff's I.Q. scores are invalid is not supported by substantial evidence.

3. The plaintiff has shown "a physical or other mental impairment imposing additional and significant work-related limitation of function."

Having established that the plaintiff met the IQ prong of 12.05(C), the question remains whether she met the additional significant limitation prong. This inquiry is whether the plaintiff has a "a physical or other mental impairment imposing additional and significant work-related limitation of function."

The Court finds that the plaintiff has met this requirement for two reasons. First, the plaintiff's inability to perform her prior relevant work alone establishes the significant work-related limitation of function requirement. See Luckey, 890 F.2d at 669. Second, according to the Secretary's own definition, a severe impairment or combination of impairments are those which significantly limit an individual's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a). Thus, the Secretary's finding that the plaintiff suffers from severe impairments, including mild degenerative disc disease, asthma, heart palpitations, borderline intellectual functioning, generalized anxiety disorder, and reduced far vision (Tr. 19), also establishes the second prong of section 12.05(C). Id.

Thus, all of the requirements of Listing 12.05(C) have been met on this record and no essential factual issues remain unresolved. Accordingly, the administrative decision should be reversed, and remanded to the Commissioner for an immediate award of benefits.

15

## III. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 13) be GRANTED, and that the Commissioner's decision be REVERSED and the cause REMANDED for an immediate award of benefits.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of receipt of this notice, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L .Ed. 2d 435 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

_____
JULIET GRIFFIN
United States Magistrate Judge